UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

ETNA PRODUCTS CO., INC.,                    :

                            Plaintiff,      :        **REPORT AND**
                                                     **RECOMMENDATION**
                -against-                   :        **TO THE HONORABLE**
                                                     <u>**SHIRA A. SCHEINDLIN**</u>
Q MARKETING GROUP, LTD., and                :
EDUARDO GORDON,                                      03 Civ. 3805 (SAS)(FM)
                                            :
                            Defendants.     :
                                            :
------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.      <u>Introduction</u>

              In this action, plaintiff Etna Products Co., Inc. ("Etna") alleged that

defendants Q Marketing Group, Ltd. ("Q Marketing") and Eduardo Gordon, Q

Marketing's president (together, the "Defendants), willfully infringed Etna's patent for a

"Magna Brite Mirror."  (Docket No. 1).  After a five-day bench trial in May 2004, Your

Honor issued an Opinion and Order, dated August 4, 2004, which found in Etna's favor.

(<u>See</u> Docket Nos. 75-81; Docket No. 87, Opinion and Order, at 39).  The Opinion and

Order awarded Etna $255,840 in compensatory damages and reasonable attorneys' fees,[1]

for which the Defendants were held jointly and severally liable.  (Docket No. 87 at 39).

---

[1]       I have used the plural form of the word "attorney" throughout this Report and
Recommendation to describe the fees that are sought because Etna seeks to recover sums that it
has been charged by two law firms.

Etna originally was directed to file its fee application "forthwith." (<u>Id.</u>).

Subsequently, by memorandum endorsement, Your Honor ordered Etna to file and serve

its fee application by August 26, 2004, and the Defendants to file and serve their response

by September 24, 2004. (Docket No. 88).

As directed, Etna's fee application was served on August 26, and Q

Marketing's opposition papers were served on September 24, 2004. In addition, Etna's

reply papers were served on September 30, 2004. (<u>See</u> Docket Nos. 89, 90, 93). The fee

application was referred to me for a Report and Recommendation once it was fully

submitted. (<u>See</u> Docket No. 91).

## II.  <u>Discussion</u>

### A.  <u>General Legal Principles</u>

Under the "American rule," a party must pay its own legal fees, unless the

reimbursement of them is authorized by a statute or agreement among the parties.

<u>Goldberger v. Integrated Res., Inc.</u>, 209 F.3d 43, 47 (2d Cir. 2000) (citing <u>Alyeska</u>

<u>Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 247 (1975); <u>Cruz v. Local Union</u>

<u>No. 3, IBEW</u>, 34 F.3d 1148, 1158 (2d Cir. 1994). Section 285 of Title 35, United States

Code, is such a statute. Pursuant to the statute, a court may award "reasonable attorney

fees to the prevailing party" in a patent case in "exceptional cases." 35 U.S.C. § 285.

In the Second Circuit, a party seeking an award of attorneys' fees must

support its request with contemporaneous time records that show, "for each attorney, the

date, the hours expended, and the nature of the work done." <u>New York State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1154 (2d Cir. 1983).  Fee applications that do not contain such supporting data "should normally be disallowed." <u>Id.</u>

The party seeking attorneys' fees is entitled to recover an amount reflecting the reasonably hourly rate of each timekeeper multiplied by the number of hours reasonably expended on the litigation.  <u>See</u> <u>Rodriguez ex rel. Kelly v. McLoughlin</u>, 84 F. Supp. 2d 417, 419 (S.D.N.Y. 1999); <u>Puglisi v. Underhill Park Taxpayer Ass'n</u>, 964 F. Supp. 811, 816 (S.D.N.Y. 1997).

In calculating the reasonable attorneys' fees, the trial court has significant discretion, <u>Goldberger</u>, 209 F.3d at 47, because it has "the best vantage point from which to assess the skill of the attorneys and the amount of time reasonably needed to litigate a case." <u>Chambless v. Masters, Mates & Pilots Pension Plan</u>, 885 F.2d 1053, 1057-58 (2d Cir. 1989).  Thus, a court may look to "its own experience generally as well as to the evidentiary submissions and arguments of the parties" in deciding the magnitude of a fee award.  <u>M.L. ex rel. M.P. v. Bd. of Educ. of the City of New York</u>, No. 02 Civ. 4288 (SHS), 2003 WL 1057476, at *4 (S.D.N.Y. Mar. 10, 2003) (quoting <u>Clarke v. Frank</u>, 960 F.2d 1146, 1153 (2d Cir. 1992)).

B.     <u>Procedural Objections</u>

In an effort to stave off an award of attorneys' fees, the Defendants advance two procedural objections which verge on the frivolous.  First, they contend that Etna's

submissions were untimely.  Second, they argue that one of the law firms that Etna engaged was a defunct corporation during the period that it rendered its services.

      1.    <u>Timeliness</u>

      The timeliness objection stems from the fact that Etna's fee application was due on August 26, 2004.  On that date, Etna served the Defendants, via regular mail, with copies of the declarations of attorneys Louis S. Ederer, Bruce E. Lilling, and Jeffrey Snyder in support of its fee application.  (<u>See</u> Decl. of Louis S. Ederer, Esq., dated Aug. 26, 2004 ("Ederer Decl." or "Ederer Declaration"), Cert. of Serv.).  Thereafter, however, Etna served the declaration of another attorney, John Maltbie, Esq., in further support of its application.  This declaration is dated September 16, 2004, and evidently was served the following day.  (<u>See</u> Decl. of John Maltbie, Esq., dated Sept. 16, 2004 ("Maltbie Decl." or "Maltbie Declaration"); Declaration of Nicholas A. Penkovsky, Esq., dated Sept. 24, 2004 ("Penkovsky Decl."or "Penkovsky Declaration"), ¶ 2).

      Ironically, the Maltbie Declaration actually <u>reduced</u> the total amount sought by Etna with respect to one of its law firms.  In its original application, Etna had estimated some of the fees for its lead law firm, Torys LLP ("Torys"), because Torys' August bill had yet to be finalized.  On the basis of that estimate, Etna initially requested that it be awarded fees and expenses totaling $641,699.06.  (Ederer Decl. ¶ 1).  This amount consisted of the fees billed (and estimated) by Torys ($485,359.45); the expenses incurred (and estimated) by Torys ($62,430.54); the fees billed by Etna's other law firm,

Lilling & Lilling, P.C. ("Lilling") ($76,885.00); the expenses incurred by Lilling ($2,423.48); and other expenses incurred by Etna ($14,600.59). (Id.). The Maltbie Declaration set forth Torys' actual August numbers, which reflected fees which were slightly lower, but expenses which were slightly higher than had been projected for that period. (Maltbie Decl. ¶¶ 4-7). As a result, Etna's total fee application was reduced from $641,699.06 to $641,019.28. (Id. ¶ 8).

Despite the Defendants' objections, Etna obviously had an obligation to correct the record once it realized that its fee application was slightly overstated.[2] Any attempt to avoid the payment of fees on the theory that the application was served out-of-time is consequently utterly baseless.

### 2.    Lilling's Status

The Defendants argue that Etna is not entitled to recover certain fees because Lilling allegedly is an inactive professional corporation. (Penkovsky Decl. ¶ 9). As support for this contention, the Defendants have submitted a printout from the website of the Division of Corporations of the New York State Department of State, which lists Lilling as an inactive domestic professional corporation. (Id. at Ex. 1). Noticeably absent

---

[2]    Thereafter, Lilling also submitted the supplemental declaration of Mr. Lilling on October 5, 2004. (See Decl. of Bruce E. Lilling, Esq., dated Oct. 5, 2004 ("Lilling Supp. Decl.")). In that declaration, Mr. Lilling seeks an additional $1,050 for fees incurred by Lilling in preparing its reply papers. (Id. ¶ 1). This had the effect of increasing Etnas's total fee application to $642,069.28. The briefing schedule set by the Court did not contemplate such a reply. Moreover, this declaration was not submitted to correct an earlier inaccuracy in Lilling's papers. Accordingly, this request for an award of additional attorneys' fees should be denied.

from the Defendants' submission, however, is any authority which suggests that a party entitled to recover attorneys' fees can do so only if its <u>counsel</u> is current in its payment of state registration fees.

In his supplemental declaration, Mr. Lilling responds that his firm was founded in 1957 by his father, that either he or his father has been the managing partner since that time, and that the name of the firm has changed from time to time as partners came and left.  (Lilling Supp. Decl. ¶ 5).  Mr. Lilling claims that "New York State has [his firm's] status wrong," but offers no proof that it is, indeed, an active corporation. (<u>Id.</u>).  However, even if Lilling has been dissolved, the corporation still could sue or be sued, and its dissolution would not affect any remedy available to or against it under New York law.  <u>See</u> N.Y. Bus. Corp. Law § 1006(a)(4), (b) (McKinney 2003).  Moreover, this is not an action initiated by Lilling in which its capacity to do business in New York might conceivably be an issue.  Rather, at this stage of this suit, the party seeking to recover fees is Etna.  Since Lilling obviously did not have to be a corporation to conduct business as a law firm, the objection that Etna should be denied a recovery of legal fees because Lilling is not an active corporation is frivolous.

C.     Multiple Attorneys / Duplicative Work

The Defendants also argue that the invoices from Lilling and Torys reflect numerous instances in which "multiple attorneys engaged in the same simple tasks and conferencing with each other about what they did" or otherwise performed duplicative

6

services.  (Penkovsky Decl. ¶ 16).  For example, the Defendants note dates when both Jacqueline Zion, an associate at Lilling, and Mr. Lilling participated in a court conference, when Ms. Zion drafted letters that Mr. Lilling subsequently reviewed, when both Ms. Zion and Mr. Lilling reviewed the same document production, and when Ms. Zion performed similar tasks over the course of several days.  (Id. at 6-8, 10-12).  Since Torys took the laboring oar at trial, the Defendants also object to Mr. Lilling's involvement in trial preparation and his presence at trial.  (Id. at 14-15).

Most of these objections are without merit.  To be sure, courts have reduced fees in circumstances "where the attorneys essentially duplicated each other's efforts." See Carrero v. New York City Hous. Auth., 685 F. Supp. 904, 908 (S.D.N.Y. 1988), aff'd, 890 F.2d 569 (2d Cir. 1989); see also Kapoor v. Rosenthal, 269 F. Supp. 2d 408, 414-15 (S.D.N.Y. 2003) (disallowing attorney's fees for work that was "duplicative and/or excessive").  Here, however, most of the disputed work does not appear to be duplicative.  For example, it is commonplace in multi-lawyer firms for a junior lawyer to draft a letter which a senior lawyer, in turn, reviews.  Indeed, under New York's disciplinary rules, Mr. Lilling was required to exercise some degree of supervision over Ms. Zion's work product.  See N.Y. Code of Prof'l Responsibility DR 1-104(C) ("A law firm shall adequately supervise, as appropriate, the work of partners, associates and non-lawyers who work at the firm.").

There similarly is no problem with both Ms. Zion and Mr. Lilling participating in the same conference with the Court or their client.  See, e.g., Kapoor, 269 F. Supp. 2d at 414; Hutchinson v. McCabee, No. 95 Civ. 5449 (JFK), 2001 WL 930842, at *3 (S.D.N.Y. Aug. 15, 2001) (finding it "entirely reasonable for both attorneys to be present at the initial meeting with the client, and for both to discuss the case with him on the telephone as it progressed").

There also is no basis for the Defendants' contention that Etna should be denied fees in instances where an attorney performed the same task over the course of several days.  For example, the Defendants note that Ms. Zion billed two hours on September 11, 2003 for "[p]reparation of response to Request to Produce Documents," and then billed an additional one-half hour for that task on September 15, 2003. (Penkovsky Decl. at 8).  There is nothing unreasonable, however, about an attorney spending a total of two and one-half hours over the course of two days to prepare a response to a document request.  Suffice it to say, the Defendants' complaints about other similar instances where work was performed over more than one day are equally baseless.

The Defendants also contend that it was not reasonable to double team them by having both Mr. Lilling and attorneys from Torys attend the trial.  (See, e.g., Penkovsky Decl. at 14-15).  In that regard, it apparently is undisputed that Mr. Lilling neither examined any of the witnesses nor argued Etna's case to the Court.  However, Mr. Lilling had served as lead counsel for Etna in this litigation between March and

8

December 2003, and he continued to play an active role in the litigation even after Torys

assumed the role of lead counsel.  Subject to a caveat noted in Section II.F, <u>infra</u>, the fees

incurred in connection with Mr. Lilling's attendance at trial are therefore a reasonable

expense for which Etna may be reimbursed.  <u>See</u> <u>Hutchinson</u>, 2001 WL 930842, at *3

("[T]he use of multiple attorneys . . . is not unreasonable per se . . . and parties are not

barred from receiving compensation for work performed by an extra lawyer [sent] into

court to observe and assist.") (internal quotation marks omitted).

       Finally, the Defendants object to conferences between or among attorneys

at Lilling and Torys.  In many instances, the Defendants have arbitrarily suggested the

deductions that they consider proper to account for such conferences.  (<u>See, e.g.</u>,

Penkovsky Decl. at 21 ("Multiple attorneys at conference, deduct one-third")).  While

there is no doubt that internal conferences can inflate a bill, they also serve a perfectly

valid function.  In this case, there has been no showing of abuse.  As Judge Kaplan aptly

observed in rejecting a similar argument:

> The handling of cases by more than one lawyer and the use of paralegals is commonplace today.  Frequently the complexity of matters requires it.  The economic interests of clients usually is served by it because the more routine tasks can be done at lower cost by personnel with less training and experience who consequently are paid less and billed at lower rates.  Thus, the conduct of litigation frequently is a joint endeavor involving the efforts of a number of individuals.
>
> Any joint endeavor requires communication among those involved to ensure that everyone is working toward the same objective, that two people do not independently do the

same thing twice, and that the insights and knowledge of all concerned are combined in the interest of achieving the common goal.  In short, the right hand must know what the left hand is doing, and communication permits the transfer of that information.  For these reasons, no one reasonably could suggest that the time spent by, for example, General Eisenhower and his officers discussing the invasion of Europe was not time reasonably devoted to the war effort and the national interest.

Litigation, to be sure, involves dramatically smaller stakes.  But the same principle applies.  Lawyers working on the same case must communicate about the conduct of the litigation.  Time so spent is reasonably devoted to the client's interest and, in the absence of an agreement to the contrary, therefore compensable.  That is not to say, of course, that internal law firm conferences cannot, in a given circumstance, go on to unreasonable lengths.  They can.  But there has been no showing that that occurred here.

Harrington Halley, LLP v. Nutmeg Ins. Co., 39 F. Supp. 2d 403, 411-12 (S.D.N.Y. 1999).

The Defendants' related contention is that they should not be penalized for attorney conference time billed as a result of Etna's decision to substitute Torys for Lilling as trial counsel in late 2003.  This argument is addressed in Section II.F, infra.

D.     Reasonable Billing Rates

The Defendants have not challenged most of the billing rates charged by the lawyers and support personnel who assisted in the prosecution of this case.  They do, however, raise two specific concerns.

First, the Defendants note that in certain months Torys gave Etna a "Courtesy Discount" which they suggest should also be applied to other months.  (See

10

Penkovsky Decl. at 24 ("10% Courtesy Discount Not Applied to this Invoice")).  Having failed to challenge the reasonableness of Torys' general billing rates, the Defendants are not entitled to insist on a discount that Torys evidently gave to its client only part of the time.  Moreover, as the Defendants themselves note, even though the discount was not extended throughout the life of this engagement, in February 2004 Torys reduced the billing rate of Mr. Ederer, the sole Torys partner assigned to this case, from $495 to $425 per hour, a discount which remained in place for all future billings.  (Penkovsky Decl. at 26; see also Ederer Decl. ¶ 28).  While Mr. Ederer was not the sole timekeeper, that discount actually exceeds ten percent.

Second, the Defendants object to a $200 charge for two hours of research by a "law clerk" at Lilling.  The Defendants assume – perhaps correctly – that this clerk is a law student.  (See Penkovsky Decl. at 14 (4/19/04 entry); Lilling Decl. Ex. A (4/30/04 Invoice at 3)).  If so, a law student's time is generally compensated at prevailing market rates, which courts have concluded are similar to the rates charged by paralegals.  See Moon v. Gab Kwon, No. 99 Civ. 11810 (GEL), 2002 WL 31512816, at *3 (S.D.N.Y. Nov. 8, 2002) (authorizing recovery of $80 per hour for law student's time).  Here, several of the Torys' paralegals assigned to this case were billed at rates of $130 per hour or more.  (See Ederer Decl. Ex. A, 6/7/04 Invoice at 17).  It follows that the $100 rate that Lilling charged for its law clerk was reasonable.

E.       Specific Objections

In addition to their general objections, the Defendants have voiced concern about certain specific items billed by Lilling or Torys.  I will address the allegations concerning each firm's statements separately.

1.       Lilling Statements

a.       Travel and Related Expenses

The Lilling statements contain a number of entries which reflect time expended by Mr. Lilling on "[p]reparation for and attendance at" court conferences.  (See, e.g., Lilling Decl., Ex. A, 8/28/03 invoice at 1, 9/30/03 invoice at 5).  In their objections, the Defendants suggest that these billings must have included travel time, which should be disallowed because it was not separately itemized.  (Penkovsky Decl. at 9).

Courts in the Second Circuit customarily "reimburse attorneys for travel time at 50% of their hourly rates."  Mr. X v. New York State Educ. Dep't, 20 F. Supp. 2d 561, 564 (S.D.N.Y. 1998); accord, M.L. ex rel. M.P. v. Bd. of Educ. of the City of New York, No. 02 Civ. 4288 (SHS), 2003 WL 1057476, at *4 n.2 (S.D.N.Y. Mar. 10, 2003).  Nevertheless, such a reduction is not mandatory.  See Hutchinson, 2001 WL 930842, at *2.  In this case, although the defendants assume that certain of the time entries on the Lilling bills related to in-court conferences include travel time, this is by no means clear.  For example, the Court held a 10 a.m. discovery conference on September 30, 2003, for which Mr. Lilling billed a total of four hours.  (Lilling Decl. Ex. A, 9/30/03 Invoice at 5).

12

His time entry indicates that this time was spent on "[p]reparation for and attendance at" the conference.  (Id.).  The Court's tape recording of that conference confirms that it was approximately one hour long.  Additionally, the Court can take judicial notice that if Mr. Lilling rode to and from the conference by train and subway, it likely took him an hour each way; if he drove the trip probably took substantially longer.  Since Mr. Lilling's entry indicates that he also prepared for the conference, there is no reason to assume that Mr. Lilling billed for his travel time.  Of course, if travel time is incorporated in this and similar time entries, it should have been listed separately.  Rather than reducing or rejecting such entries, however, I have dealt with them in a different manner, which is discussed in Section II.F, infra.

The Defendants also object to a claimed disbursement of $1,500 for lodging for Mr. Lilling in New York City during the trial.  (Penkovsky Decl. at 15).  The Defendants note that Mr. Lilling elected to file this action at the Courthouse in lower Manhattan even though his office is in Westchester.  (Id.).  The Defendants also object that Lilling has not provided a receipt to support this disbursement.  (Id.).  Mr. Lilling responds that his residence is located two hours from New York City, and that he decided to stay in a hotel so that he could participate in the preparation of witnesses each night. (Lilling Supp. Decl. at 7).

An award of attorney's fees may include "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  LeBlanc-

Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998).  Given the intense level of

activity commonly associated with a multi-day federal trial, it is understandable that

counsel would have wanted to remain in New York City each night.  See Yamanouchi

Pharm. Co. v. Danbury Pharmacal, Inc., 51 F. Supp. 2d 302, 307 n.7 (S.D.N.Y. 1999)

("Trial preparation, I am sure, went on into the night with various parties necessary at

various times, and it was expedient to coordinate at least some of this preparation by

using the services of a hotel.").  Accordingly, the relatively modest amount that Etna

spent to house Mr. Lilling in New York City during the trial is recoverable, despite the

lack of a statement from the hotel.  See Goodwin v. Boesky (In re Boeksy Sec. Litig.),

888 F. Supp. 551, 564 (S.D.N.Y. 1995) (estimating the amount of disbursements where

counsel's request for expenses was not supported by "appropriate documentation").

                                                     b.     Stipulated Protective Order

            The Defendants also argue that Etna should not be compensated for time

spent by Lilling on the proposed protective order because Mr. Lilling failed to negotiate

in good faith.  (Penkovsky Decl. at 8).  In response, Mr. Lilling asserts that it was defense

counsel who hindered the signing of an agreed protective order.  (Lilling Decl. ¶ 26).

            The negotiation of the protective order in this case will not be cited by

future generations of lawyers as a shining moment in the history of trial advocacy.

Indeed, the barrage of letters that was generated bore little relationship to the complexity

of the task at hand.  According to the Defendants, Etna's fee request seeks to recover for

12.7 hours of Mr. Lilling's time devoted to the Protective Order even though the language I ultimately adopted was taken almost entirely from the version proposed by the Defendants. While it is true that the original protective order was subsequently amended twice, the time spent on this project was grossly excessive. Accordingly, 2.7 hours of time should be allowed (and ten hours should be disallowed).[3]

_____          c.     Preliminary Injunction

The Defendants also contest several time entries relating to a proposed preliminary injunction that Etna never pursued. (Penkovsky Decl. at 9-10). The billing for this purpose, which totals $2,360, should be disallowed. See Gierlinger v. Gleason, 160 F.3d 858, 880 (2d Cir. 1998) (affirming trial court's refusal to compensate prevailing party for motions that were never filed).

            d.     Fax Charges

Lillings' bills also contain numerous entries for "[d]omestic facsimile charges." (See Lilling Decl. Ex. A). "Local faxes are generally not compensable." Lavin-McEleney v. Marist Coll., No. 96 Civ. 4081 (KJF), 1999 WL 33500070, at *7 (S.D.N.Y. Sept. 28, 1999), aff'd, 239 F.3d 476 (2d Cir. 2001). Since none of the Lilling entries indicate that the faxes involved long distance calls, these charges (totaling $214) should be disallowed.

---

[3]     Reviewing the Lilling statement, it appears that Lilling may actually have spent more time on the Protective Order issue. Nonetheless, because the Defendants contend that only 12.7 hours were billed for that purpose, I have excluded only ten hours.

2.      Torys' Statements

_____                    a.      Services Prior to Torys' Formal Appearance

The Defendants argue that Etna should not be allowed to recover any fees for Torys' services prior to December 2003, when, according to Mr. Lilling, Torys was engaged to act as Etna's lead trial counsel.  (Penkovsky Decl. ¶¶ 12-13 (quoting Lilling Decl. ¶ 12)).

In fact, Torys filed its notice of appearance on November 26, 2003. (Docket No. 34).  Prior to this date, Torys had billed only 10.4 hours, nearly half of which involved non-lawyer time.  (See Ederer Decl. Ex. A).  In their papers, the Defendants do not explain why these time entries should be disallowed.  Since a client is entitled to have more than one lawyer work on its matters, I fail to see why the ministerial act of filing a notice of appearance should determine the propriety of Torys' earlier time charges. Moreover, the Defendants have not cited any authority suggesting that this is a required dividing line.

The set-off requested by the Defendants should therefore be denied.

b.      Belatedly Disclosed Witness

_____The Defendants also contend that the time charges related to Etna's "belatedly disclosed witnesses," including Don Onorato, Etna's sales representative, should be disallowed.  (Penkovsky Decl. at 16, 26-27).  It appears that this description of the witnesses – especially Mr, Onorato – is misleading since Etna apparently "provided a

list of all its potential witnesses by noon" on March 5, 2004, which was the date by which all witnesses had to be disclosed.  (Ederer Decl. ¶ 46(d); see also Docket No. 45).  Indeed, the Defendants appear to concede that this is so.  (See Penkovsky Decl. at 16 (complaining that Onorato was not identified "until the last day to disclose witnesses") (emphasis added).[4]

In the absence of any showing that Your Honor precluded any of Etna's witnesses on the ground that they were not timely identified, this objection, too, is meritless.

c.    Motion to Preclude

The Defendants also object to Etna's request to be compensated for more that eighty hours of attorney time in April 2004 related to a motion to preclude the trial testimony of three of the Defendants' witnesses and the introduction of related evidence. (Penkovsky Decl. at 17).  They maintain that this cost should not be allowed because the motion was "unsuccessful."  (Id.).

As the Second Circuit has noted, the standard for determining whether a party may recover fees for a motion is not whether the motion was unsuccessful, but

---

[4]       Etna later filed a Supplemental Identification" of its trial witnesses on April 14, 2004.  (See Docket No. 56).  While Your Honor is in the best position to determine whether this was improper, I note that the Defendants repeatedly sought to supplement their exhibit list after that deadline for identifying exhibits had passed.  (See Ederer Decl. ¶¶ 46(i), (j), (k)).  The Defendants themselves also identified three new witnesses on April 1, 2004, after the deadline for identifying witnesses and long after discovery was closed.  (Id. ¶ 46(g); see also Docket No. 53 (Defendants' motion to waive requirement that witnesses be identified thirty days prior to trial).

whether it was frivolous.  Seigal v. Merrick, 619 F.2d 160, 164-65 (2d Cir. 1980).  Here, the Defendants make no suggestion that Etna's motion to preclude descended to this level.  Accordingly, Etna is entitled to be reimbursed for the time that the Torys attorneys spent on the motion, provided that those hours are reasonable.  See Big R Food Warehouses v. Local 338 RWDSU, 896 F. Supp. 292, 298 (E.D.N.Y. 1995) (allowing recovery of fees associated with an unsuccessful motion for default judgment where "there was no suggestion that the motion was frivolous").

The Defendants suggest that Torys spent sixty-two hours on its moving papers, plus an additional twenty-two hours on its reply papers.  (Penkovsky Decl. ¶ 20). It is difficult to understand how the Defendants arrived at these figures since Torys' bills do not break out the hours devoted to discrete tasks on days when its timekeepers performed multiple tasks.  Torys may therefore actually have spent more time on this motion than the Defendants suggest.  In any event, even if I were to assume that the Defendants' lower figures are correct, the amount of time devoted to this motion still seems excessive.  Accordingly, a $10,000 reduction in Torys' fees for the month of April is appropriate.  At a blended rate of $318 per hour, this reflects a reduction of approximately 31.4 hours.

### d.    Trial by Surprise

The Defendants also contend that Torys' fees for May 2004 should be reduced by one-half to punish Torys for resorting to "trial[] by surprise."  (Id.).

According to the Defendants, Torys' conduct in this regard "clearly violated the Federal Rules of Discovery" and the Court's directives "to produce trial documents in a timely manner." (Id.).

The hours amassed by Torys during May 2004 (when the trial was held) seem reasonable. Moreover, I am mindful of Your Honor's conclusion that it was not Etna, but the Defendants who were "uncooperative in discovery by failing to produce documents demanded by Etna and by tardy production of relevant information." (Docket No. 87, Opinion and Order, at 38). For this reason, I reject the Defendants' proposed set-off as meritless.

e.   Unrelated Work

The Defendants also claim that the Torys' invoices reflect time spent on an unrelated matter which was billed to this case. (Penkovsky Decl. ¶ 26). The Defendants' reference appears to be to an entry for 0.20 hours that Mr. Ederer spent on the "XJ Group matter" on June 11, 2004. (Ederer Decl. Ex. A, 7/21/04 Invoice at 4). As Mr. Ederer readily concedes in Etna's reply papers, that time entry is a mistake and should be disallowed. (Reply Decl. of Louis S. Ederer, Esq., dated Sept. 29, 2004, ¶ 12). Contrary to the Defendants' contention, however, one such mistake does not cast doubt on the merits of the remainder of Torys' June bill, thereby necessitating the twenty-five percent reduction in fees for that month that the Defendants suggest is the appropriate remedy.

(See Penkovsky Decl. ¶ 26).  Instead, the Defendants are entitled to only an $85 reduction.

> f.   Fax Charges

The Torys' invoices contain numerous entries for "Local and Out-of-State Faxes."  (Ederer Decl. Ex. A).  Since long distance faxes are not separately identified, these sums must be disallowed.  The Defendants are mistaken, however, in suggesting that the proper deduction for faxes on Torys' June 2004 invoice (for services rendered in April) is $674.76.  (See Penkovsky Decl. ¶ 21).  In fact, that sum was for copying charges.  (See Ederer Decl. Ex. A, 6/7/04 Invoice at 18).  The correct total offset for faxes improperly billed by Torys is therefore $387.

> g.   Miscellaneous

Torys' June 30, 2004 invoice for services during the month of May also reflects a disbursement in the amount of $760.71 for "Miscellaneous."  In the absence of any further explanation of this entry, Etna is not entitled to recover this sum.

> F.   Other Relevant Factors

As noted earlier, I have not attempted to quantify the dollar value of the Defendants' proposed adjustments for travel time.  The Defendants also have proposed certain other minor adjustments which are not discussed in this Report and Recommendation.  I have refrained from any detailed discussion of these items because

they are dwarfed by two other factors that must be considered in determining the sum that Etna should be awarded as its reasonable attorneys' fees.

First, while a client ordinarily may add lawyers to its team whenever it wishes to do so, any experienced litigator knows that this inevitably will lead to a certain degree of inefficiency. Here, although Lilling remained involved in this case to some extent, the addition of Torys was really a substitution of counsel, at least insofar as the trial was concerned. As a result, some of the time that Lilling expended in this case was likely duplicative of time that Torys billed. Moreover, the Torys attorneys obviously had to spend time educating themselves about factual details that Mr. Lilling had already mastered.

Second, while much of the Defendants' criticism of opposing counsel is unwarranted, at least at the outset of the parties' dealings with me (pursuant to a referral for General Pretrial supervision), Mr. Lilling was unnecessarily litigious. (I hasten to add that this same criticism can be leveled against the Defendants' counsel during later time periods.) As a result, Etna's legal expenses were needlessly increased.

The effect of these two factors on the cost of this litigation is not something that is readily quantified. Nonetheless, some offset clearly is appropriate so that the Defendants are only required to pay their adversary's reasonable attorneys' fees. For this reason, I have concluded that Lilling's bills for legal fees (but not disbursements) should be reduced by twenty percent after all other adjustments have been made. See Carey, 711

21

F.2d at 1146 (stating that trial judges have the discretion to make percentage reductions in response to claims that fee applications contain "excessive and duplicative hours").

Although Your Honor had far more frequent dealings with Torys than I did, my own impression is that the Torys attorneys were highly professional in their approach to this case. As a consequence, I do not believe that a similar across-the-board reduction in Torys' fees is appropriate.

G.    Summary

For the reasons set forth above, Etna's application to recover a total of $642,069.28 in attorneys' fees and expenses should be reduced as follows:

| ITEM | DATES | AMOUNT | SUBTOTAL |
|---|---|---|---|
| **Lilling** | | | |
| Lilling Reply Papers | 10/05/04 | $1,050.00 | $1,050.00 |
| Protective Order[5] | Various | 3,500.00 | 3500.00 |
| Preliminary Injunction | 09/29/03:<br>09/30/03:<br>10/08/03: | 700.00<br>60.00<br>1,600.00 | 2360.00 |
| Twenty Percent of Adjusted Time Billings | | 14,205 | 14,205 |
| Faxes | Various | 214.00 | 214.00 |
| | | **Lilling Total** | $21,329 |

---

[5]    Because most of the time that Lilling spent on the protective order was billed by Mr. Lilling, I have used his $350 hourly billing rate to calculate the amount to be deducted from Etna's fee application.

22

| Torys | | | |
|---|---|---|---|
| Motion to Preclude | Various | $10,000.00 | 10,000.00 |
| XJ Group Error | 06/11/04 | 85.00 | 85.00 |
| Fax Charges | Various | 387.00 | 387.00 |
| "Miscellaneous" | 06/30/04 | 760.71 | 760.71 |
| | | **Torys Total** | $11,232.71 |
| | | **Total Deductions** | $32,561.71 |

Etna should therefore be awarded as its reasonable attorneys' fees and expenses the sum of $609,507.57 ($642,069.28 - $32,561.71).

III.   Conclusion

The judgment to be entered in this case should award Etna attorneys' fees and expenses in the amount of $609,507.57.

IV.   Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Shira S. Scheindlin, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Scheindlin.  Any failure to file timely objections will result in a waiver of those

objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:        New York, New York
              June 6, 2005


                                    _____
                                          FRANK MAAS
                                    United States Magistrate Judge




Copies to:

Hon. Shira S. Scheindlin
United States District Judge

Bruce E. Lilling, Esq.
Lilling & Lilling, PC
Fax:    (914) 684-0304

Louis S. Ederer, Esq.
Torys, LLP
Fax:    (212) 682-0200

Nicholas A. Penkovsky, Esq.
Law Offices of Nicholas A. Penkovsky, P.C.
Fax:    (212) 216-9491